**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 17-1526

SHENG DA DONG,

Petitioner,

v.

JEFFERSON B. SESSIONS III, Attorney General,

Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued: May 9, 2018                                     Decided: July 20, 2018

Before THACKER and HARRIS, Circuit Judges, and SHEDD, Senior Circuit Judge.

Petition for review granted and remanded for further proceedings by unpublished opinion. Judge Harris wrote the opinion, in which Judge Thacker and Judge Shedd joined.

**ARGUED:** Henry Zhang, ZHANG & ASSOCIATES, P.C., New York, New York, for Petitioner. Sergio F. Sarkany, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Chad A. Readler, Acting Assistant Attorney General, Kiley Kane, Senior Litigation Counsel, Office of Immigration Litigation, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

Unpublished opinions are not binding precedent in this circuit.

PAMELA HARRIS, Circuit Judge:

Sheng Da Dong, a native and citizen of China, seeks asylum and withholding of removal from the United States. If repatriated, Dong fears persecution by Chinese authorities, who already once have detained, interrogated, and beaten him unconscious for his association with Falun Gong, an outlawed spiritual practice.

Because Dong has suffered past persecution, he is entitled to a presumption that his fear of future persecution is "well-founded," as required to qualify for relief. The Board of Immigration Appeals found that the presumption was rebutted by a showing of fundamentally changed circumstances – specifically, that Chinese authorities no longer perceive Dong as a dissident deserving of punishment. Alternatively, the Board concluded, the presumption was rebutted because the Immigration Judge properly found that Dong could avoid future persecution by relocating within China. On both these grounds, the Board denied asylum and withholding of removal.

We conclude that the Board erred in holding that the government rebutted the presumption of a well-founded fear of persecution. The burden in this case fell squarely on the government, and there is not substantial record evidence to support a finding that the government established, by a preponderance of the evidence, the requisite "changed circumstances." As for whether future persecution could be avoided through relocation, the government concedes that the burden improperly was shifted to Dong on that issue. Accordingly, we vacate the Board's denial of asylum and withholding of removal, and remand for further proceedings consistent with this opinion.

# I.

We begin with the statutory and regulatory background relevant to Dong's petition. The Immigration and Nationality Act ("INA") gives the Attorney General the discretion to "grant asylum to applicants who qualify as 'refugees.'" *Ilunga v. Holder*, 777 F.3d 199, 206 (4th Cir. 2015). A "refugee" is an applicant who, among other things, is "unable or unwilling to return" to his home country "because of persecution or a well-founded fear of persecution." *See* 8 U.S.C. § 1101(a)(42)(A). This appeal turns on whether Dong qualifies as a refugee under the "well-founded fear of persecution" standard.

Ordinarily, an applicant for relief bears the burden of showing a well-founded fear of persecution. *See Tassi v. Holder*, 660 F.3d 710, 720 (4th Cir. 2011). But – critically for this case – if an applicant shows that he has suffered "past persecution," then he "is *presumed* to have the required well-founded fear of persecution." *Li Fang Lin v. Mukasey*, 517 F.3d 685, 692–93 (4th Cir. 2008) (emphasis added); *see* 8 C.F.R. § 1208.13(b)(1). The burden then shifts to the government to rebut that presumption, which it can do by establishing, by a preponderance of the evidence, one of two things: either that there has been a "fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution," 8 C.F.R. § 1208.13(b)(1)(i)(A), (ii), or that the applicant "could avoid future persecution by relocating to another part" of his country, 8 C.F.R. § 1208.13(b)(1)(i)(B), (ii). *See Li Fang Lin*, 517 F.3d at 693. If the government cannot meet this burden, then the applicant has established the requisite well-founded fear.

4

The standard for withholding of removal, another form of relief sought by Dong, is more stringent than the standard for asylum. Entitlement to withholding of removal requires not only that the applicant qualify as a "refugee" eligible for asylum, but also a "clear probability" that his "life or freedom would be threatened" if he were sent back to his home country. *Anim v. Mukasey*, 535 F.3d 243, 252–53 (4th Cir. 2008); *see* 8 U.S.C. § 1231(b)(3)(A). Accordingly, if Dong cannot satisfy the well-founded fear of persecution standard for asylum eligibility, then it follows that he is not entitled to withholding of removal. *See Anim*, 535 F.3d at 253.

## II.

In July 2009, Sheng Da Dong was taken into custody for entering the United States without authorization. After an asylum officer made an initial determination that Dong credibly feared persecution if returned to China, the Department of Homeland Security charged Dong with removability and issued a notice to appear for a hearing to consider whether he qualified for relief. *See* 8 U.S.C. § 1225(b)(1)(B)(ii). Dong conceded removability and applied for asylum and withholding of removal.[1]

In May 2011, Dong testified before the Immigration Judge ("IJ") and submitted evidence supporting his application. We start by summarizing the testimony and evidence, and then describe the ensuing agency proceedings.

---

[1] Dong also sought relief under the Convention Against Torture, or "CAT." The Immigration Judge rejected that claim on the ground that Dong had presented no evidence of the likelihood of "torture" as defined by the CAT, and Dong waived his appeal of that finding. Accordingly, we do not address the issue further.

## A.

In early 2009, Chinese police arrested Dong for passing out pamphlets on the streets of his hometown in Fuzhou City, the capital of China's Fujian province. Dong was unaware at the time that the pamphlets promoted Falun Gong, a spiritual practice banned by the Chinese government as an "evil cult." A.R. 163. At a local police station, officers handcuffed Dong to a pole and interrogated him for two days about his connections to Falun Gong. During Dong's interrogation, police repeatedly struck him with batons, chairs, and their fists until he lost consciousness and had to be hospitalized. When Dong awoke the next day, he observed police guarding his hospital room. Afraid for his safety, Dong escaped through a first floor window and took shelter at a friend's house. After Dong's parents told him that police were searching for him at his home, Dong remained in hiding.

Two months later, using documents provided by a "snakehead" – a professional smuggler of Chinese migrants – Dong flew from China to Venezuela. From there, Dong traveled to Cuba and then to Mexico, where he began a journey on foot toward the United States. In July 2009, the United States Border Patrol apprehended Dong near Hidalgo, Texas.

At his removal hearing, Dong expressed fear that if he returns to China he again "will be arrested, . . . beaten, and . . . tortured." A.R. 381. When asked why he feared that outcome, Dong explained that in September 2009, six months after he was arrested in China, his parents informed him that police still were searching for him at his home.

6

When asked whether the police had been to his house since then, Dong responded that he and his parents "didn't talk about that anymore." *Id.*

Dong also testified that after being released from custody, he obtained a passport from the Consulate General of the People's Republic of China in New York (hereinafter "New York consulate"). The consulate issued him the passport, Dong said, without mentioning his arrest in China or his association with Falun Gong. The parties agree that the passport was issued at some point in September 2009, the same month during which Chinese police were searching for Dong at his parents' house.

In addition to his testimony, Dong submitted an affidavit from his father, Qi Feng Dong, corroborating Dong's account and averring that, even after Dong fled, Chinese authorities "came to [the family's] home to look for [Dong] many times and asked . . . Dong to surrender himself as soon as possible or they would punish him severely." A.R. 553. Both Dong and the government also submitted background information on China's efforts to persecute individuals associated with Falun Gong. A State Department report submitted by the government, for instance, explained that Chinese authorities have "launched a massive anti-Falun Gong propaganda campaign, initiated a comprehensive effort to round up practitioners not already in custody, and sanctioned high pressure indoctrination tactics in order to force practitioners to renounce Falun Gong," including "beatings," "torture," and "reeducation-through-labor." A.R. 499.

**B.**

This case has a long procedural history, beginning with the first of the IJ's three decisions on Dong's application, issued in 2011. After reviewing the evidence and

7

Dong's testimony, the IJ concluded that Dong was credible, observing that his account was consistent with notes taken by the asylum officer during his initial interview and with other record evidence. Nevertheless, the IJ denied Dong's application, on the ground that Dong had failed to establish a well-founded fear of future persecution.

In considering that question, the IJ did not give Dong the benefit of the presumption of a well-founded fear that arises from past persecution. That was because, in the IJ's view, the prior detention and beating suffered by Dong were not severe enough to constitute "past persecution," triggering the presumption. Instead, the burden remained on Dong, who could not establish, according to the IJ, that his fear of future persecution in China was "well-founded." In reaching that conclusion, the IJ noted that Dong had not shown why he could not relocate to a different part of China to avoid any risk of persecution. He also suggested that the issuance of a passport to Dong "would seem to undercut" the prospect that Chinese officials were prepared to persecute him upon his return. A.R. 427. Because Dong had not met his burden of showing a well-founded fear of persecution, the IJ concluded, he was not eligible for asylum, which meant that he also was not entitled to withholding of removal.

Dong appealed the IJ's decision, and a one-member panel of the Board of Immigration Appeals ("Board" or "BIA") sustained the appeal. The IJ erred, the Board concluded, in failing to apply the presumption of well-founded fear to Dong's case, because the beating sustained by Dong – accompanied by a loss of consciousness and hospitalization – was indeed sufficiently severe to constitute "past persecution." The Board thus remanded to the IJ to consider whether the government could rebut the

presumption that Dong had a well-founded fear of further persecution upon return to China.

Although it now bore the burden of proof, the government waived the opportunity for an additional hearing and submitted no additional evidence. The IJ again ruled against Dong. The presumption of a well-founded fear of persecution was rebutted, the IJ held, primarily because Dong had testified that he actually was *not* an adherent of Falun Gong, while country reports indicated only that China was intent on persecuting those who *are* Falun Gong practitioners. "By his own testimony [Dong] does not belong to this targeted group of individuals, and the [court] is not convinced from the evidence that the Chinese government would continue to impute a belief in Falun Gong to [Dong] and subject him to the mistreatment described in the country reports." A.R. 107–08. Also, the IJ reasoned, that Dong "was able to renew his passport without incident" suggested that he would not be persecuted on return to China. A.R. 108. Accordingly, the IJ held, the "preponderance of the evidence shows that [Dong] does not have a well-founded fear of future persecution." *Id.*

The BIA again sustained Dong's appeal. The IJ, the Board found, had not addressed whether the government met its burden of establishing fundamentally "changed circumstances" so as to rebut the presumption of a well-founded fear. That Dong in fact does not practice Falun Gong, the Board explained, is not in itself a "changed circumstance": Dong also had not been a Falun Gong practitioner the first time he was persecuted, and that had not stopped the Chinese government from imputing to him pro-Falun Gong beliefs. Nor was it clear that the IJ had determined that Dong's

9

ability to obtain a passport amounted to a "fundamental change in circumstances" sufficient to rebut the presumption – as an indication, for instance, that the Chinese government no longer was interested in punishing Dong. Accordingly, the Board remanded once again, so that the IJ could "consider whether there are changed circumstances and, if so, explain why there are changed circumstances." A.R. 75. The BIA also suggested that the IJ might address the second means of rebutting the presumption of a well-founded fear, and whether "harm to [Dong] could be avoided by his relocating within China." *Id.*

For the third time, the IJ ruled against Dong. The government again declined to offer supplemental evidence to meet its burden of proof. The IJ determined, however, that the record evidence satisfied the "fundamental change in circumstances" standard for rebuttal. Specifically, the IJ determined that the Chinese government's willingness to issue Dong's passport "evinces its acceptance of his past behavior" and that it "is no longer interested" in Dong. A.R. 47. That is enough, the IJ concluded, to constitute a fundamental change in personal circumstances for purposes of rebutting the presumption. In a footnote, the IJ also noted that Dong "testified the last time his parents told him police looked for him was September 2009," which he took as support for his determination that the "Chinese government quickly lost interest" in Dong after his initial persecution. A.R. 47 n.2.

The IJ then turned to the alternate means of rebutting the presumption, making a separate finding that Dong could "not meet his burden to show it would be unreasonable for him to relocate within China to avoid persecution in the future." A.R. 48. That was

10

so, the IJ reasoned, because neither the record evidence nor country conditions suggested that "Chinese authorities communicate with one another," and would track Dong from one province to another if he relocated; instead, the issuance of Dong's passport "suggests there is no national system in place that alerts local officials in a new place as to [Dong's] past activities." A.R. 49. For this reason, too, the IJ held that the presumption of a well-founded fear of persecution had been rebutted.[2]

Dong appealed, and this time the BIA affirmed the IJ's ruling. The Board upheld the IJ's determination that "there has been a fundamental change in circumstances such that [Dong] no longer has a well-founded fear of persecution," in that the Chinese government no longer imputes to Dong pro-Falun Gong political views or has an interest

---

[2] The IJ also took the view that the risk of future persecution is mitigated in this case because Chinese authorities focus primarily on persecuting "high-profile" Falun Gong activists, and not "lay persons" whose conduct, like Dong's, is "limited to handing out pamphlets." A.R. 48. The IJ did not treat this factor as evidence of a "change in circumstances" under 8 C.F.R. § 1208.13(b)(1)(i)(A), and properly so; there is nothing to suggest that there has been any "change" in Chinese policy on this matter since Dong initially was persecuted precisely for handing out pamphlets and despite the absence of any "high-profile" activity. Under the governing regulation, there are two and only two means of rebutting the presumption of a well-founded fear of future persecution – changed circumstances and reasonableness of relocation – and evidence that goes to neither of those factors but only to a general likelihood of future persecution cannot suffice to meet the government's rebuttal burden. *Id.* § 1208.13(b)(1)(i)(A)–(B). Indeed, in adopting its current regulation, the agency rejected a proposal that would have allowed for more generalized consideration of any evidence bearing on the likelihood of future persecution. *Compare* New Rules Regarding Procedures for Asylum and Withholding of Removal, 63 Fed. Reg. 31,945, 31,947, 31,949 (proposed June 11, 1998) (proposing that government may rebut presumption based on "any evidence, or lack thereof, bearing on future persecution"), *with* Asylum Procedures, 65 Fed. Reg. 76,121, 76,127, 76,133 (Dec. 6, 2000) (final rule explaining that regulatory language "is changed to state that the [government] must show a 'fundamental change in circumstances' in order to overcome the presumption").

11

in harming him.  A.R. 4.  And it found "no clear error" in the IJ's determination that the presumption also was rebutted because Dong can "safely relocate" within China.  *Id.*

Dong timely petitioned this court for review.

**III.**

When the Board affirms an IJ's order with an opinion of its own, as here, we review both decisions.  *Salgado-Sosa v. Sessions*, 882 F.3d 451, 456 (4th Cir. 2018).  The issue presented in this appeal is whether the agency erred when it found that the presumption of a well-founded fear of persecution, triggered by Dong's past persecution, had been rebutted.  We review that determination, which we have recognized as a factual finding, under a substantial evidence standard, affirming so long as a reasonable factfinder could agree with the agency's conclusions.  *See Essohou v. Gonzales*, 471 F.3d 518, 520 (4th Cir. 2006).

In the ordinary case, the applicant bears the burden of proof as to refugee status and asylum eligibility, and a denial of asylum is based on the agency's conclusion that the *applicant* failed to meet his evidentiary burden.  In such cases, we ask whether the record evidence so clearly supports the applicant's position that "no reasonable factfinder could fail to find eligibility."  *Dankam v. Gonzales*, 495 F.3d 113, 119 (4th Cir. 2007).  Here, our inquiry is slightly but critically different.  The question in this case is whether the *government* sustained *its* burden of proof, establishing by a preponderance of the evidence one of the two conditions that will rebut the presumption:  that there has been a "fundamental change in [Dong's] circumstances" since he last was persecuted, so that he

12

no longer has a well-founded fear that he will be persecuted again; or that Dong can avoid persecution by safely relocating to a different area of China. *See* 8 C.F.R. § 1208.13(b)(1)(i), (ii). So under the substantial evidence standard, we must defer to the agency's findings unless a reasonable factfinder would be "compelled to conclude" that the government had not met its burden of showing changed circumstances or the possibility of relocation by a preponderance of the evidence. *See Essohou*, 471 F.3d at 520, 522.

## A.

We begin with the agency's determination that a "fundamental change in circumstances" rebutted the presumption that Dong's fear of future persecution was "well-founded" in light of his past experience. The government established a fundamental change, the agency held, by proving that the Chinese government no longer views Dong as a Falun Gong adherent and thus no longer wishes to mistreat him. To reach that conclusion, the agency relied on two facts: first, that the Chinese consulate in New York issued Dong a passport; and second, that Dong's parents last informed him that Chinese authorities searched for him at their home in September of 2009. After careful consideration of the record as a whole, we are compelled to conclude that neither of those facts, taken separately or together, reasonably could be seen as sufficient to establish by a preponderance of the evidence that the Chinese government "lost interest" in Dong, A.R. 47 n.2, after his initial detention and beating.

The agency placed primary reliance on issuance of the passport, a fact noted in each of the IJ's decisions rejecting Dong's application. The agency's theory is as

13

follows: A State Department report says that the Chinese government refuses reentry to citizens who are "considered dissidents, Falun Gong activists, or 'troublemakers.'" A.R. 47. So, the agency reasons, if the Chinese government perceived Dong to be a pro-Falun Gong activist deserving of punishment, then the New York consulate would have refused to issue him a passport. By instead issuing a passport, the New York consulate signaled the Chinese government's willingness to "accept[] Dong's past behavior" and its decision no longer to impute to him pro-Falun Gong sympathies. *Id.*

That finding is flawed in two principal respects. First, it is contradicted by other record evidence. The agency credited and specifically relied upon Dong's testimony that in the same month during which his passport was issued in New York – September of 2009 – Chinese police were searching for Dong at his parents' house, in connection with his initial distribution of Falun Gong pamphlets. *See* A.R. 47 n.2. But as Dong argues, issuance of a passport in New York cannot mean that Chinese authorities had "lost interest" in him if local police simultaneously were pursuing him at home. The government has offered no explanation for this significant contradiction, and the agency at no point addressed it. As a result, we are left with an agency inference that cannot be "square[d] . . . with the undisputed facts of the case." *Temu v. Holder*, 740 F.3d 887, 891 (4th Cir. 2014) (vacating under substantial evidence standard because agency conclusion is logically inconsistent with record evidence).

There is, however, a different inference that could be drawn from Dong's passport, one which *is* consistent with the timeline adopted by the agency. It is possible, as Dong argues, that the reason he was issued a passport is not because Chinese authorities had

14

ceased imputing to him pro-Falun Gong sympathies, but because "there is no national system in place," A.R. 49, that would have alerted the New York consulate to Dong's original arrest and persecution, or to any future plans local police might have for him. And indeed, in another part of his opinion, the IJ himself adopted precisely that view, explaining that Dong had not shown that safe relocation within China was infeasible because "it is unlikely local authorities among the provinces communicate with one another or with the national authorities." A.R. 48–49. The passport itself, the IJ concluded, was suggestive not of a change in heart on the part of Chinese authorities, but of a simple communications gap: Dong's "ability to receive a valid Chinese passport suggests there is no national system" for tracking the past activities of Chinese citizens like Dong. A.R. 49; *cf. Temu*, 740 F.3d at 892 (vacating under substantial evidence standard where agency makes "internally contradictory" findings). And this alternative inference, of course, has the virtue of explaining why the New York consulate might issue a passport to Dong even as local police continued to hunt for him at his parents' house in China.

That brings us to the second problem with the agency's finding. Citing *Niang v. Gonzales*, 492 F.3d 505 (4th Cir. 2007), the government insists that where the record "plausibly could support two results" – the one chosen by the agency, and a competing one advanced by the applicant – "reversal is only appropriate where the court finds that the evidence not only supports the opposite conclusion but compels it." *Id.* at 511 (internal quotation marks and emphasis omitted). But that is the standard that applies, as the court was careful to explain in *Niang*, when the "*applicant* . . . bears the burden" of

15

establishing the result in question, *id.* at 510 (emphasis added), and so we need not decide in this case whether the evidence not only supports but also "compels" the inference advanced by Dong. Here, the burden is on the *government*, and the government must prove that the inference the agency drew from the passport is "*more* probable" than Dong's alternative explanation. *See Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 622 (1993) (emphasis added) (defining "preponderance of the evidence" standard). The agency nevertheless cited no evidence and offered no "reasoned explanation," *Tassi*, 660 F.3d at 719, for why its inference, even if plausible – notwithstanding, that is, its inconsistency with other record evidence and a key part of the IJ's own analysis – is *more* convincing than plausible inferences pointing in the other direction. *See Metro. Stevedore Co. v. Rambo*, 521 U.S. 121, 137 n.9 (1997) (defining preponderance of the evidence standard as met when the evidence in favor of a proposition is "more convincing" than the evidence against).[3] Under these circumstances, and in light of all of the record evidence, we conclude that no reasonable factfinder could determine that the government had met its burden of proving that it is "more probable than [not]," *Concrete Pipe*, 508 U.S. at 622, that issuance of Dong's passport reflects a decision by Chinese authorities to forgo further persecution of Dong.

---

[3] Indeed, neither the IJ nor the BIA ever referred expressly to the government's burden of proof on this issue, nor linked that burden to the preponderance of the evidence standard to which the government is held. On the one occasion the IJ did mention the burden of proof, he incorrectly assigned to Dong the burden of showing that he could not avoid the risk of persecution by relocating within China, A.R. 48, as we discuss below.

Although the IJ relied primarily on the issuance of Dong's passport for its "changed circumstances" determination, he also noted testimony by Dong purportedly establishing that Chinese authorities "ceased pursuing him" after September 2009, and have not searched for him since. A.R. 47 n.2. From this "concession," Gov't Br. 17, the agency concluded that the "Chinese government quickly lost interest in [Dong] after his two-day detention." A.R. 47 n.2.

As an initial matter, the agency's premise – that Dong testified that authorities stopped searching for him after September 2009 – is not supported by the record. Dong testified only that September 2009 was the last time he spoke to his parents about Chinese police searching his family's home. When asked, "Have the police been to your house looking for you since September of 2009?," Dong answered, "Well, we didn't talk about that anymore." A.R. 381. That is not a concession that the police never again visited Dong's home, let alone that they "ceased pursuing him" altogether. Indeed, when later asked whether he believes "the government is actively looking for [him]," Dong responded, "Yes," A.R. 383 – consistent with the fact, acknowledged by the agency, that Chinese authorities "continue to detain and harm Falun Gong practitioners in China." A.R. 48 n.3. The agency's reliance on Dong's testimony to show that Chinese authorities have stopped searching for him rests on an "inaccurate perception[] of the record or . . . speculation and assumption," neither of which is sufficient to sustain its finding under the substantial evidence standard. *See Tassi*, 660 F.3d at 725.

And again, even if we were to assume the validity of the agency's finding that police stopped searching for Dong after September 2009, the burden would be on the

17

government to prove that this makes it more probable than not that Chinese authorities no longer impute pro-Falun Gong sympathies to Dong and have "lost interest" in persecuting him. As with issuance of the passport, however, there are other equally or more plausible inferences that could be drawn. For instance, authorities may have stopped searching for Dong at his home after September 2009 because they learned that Dong had fled the country – likely the case if, as the agency assumes for its ultimate conclusion regarding Dong's passport, the New York consulate and local Chinese authorities are in communication about citizens like Dong. Or perhaps the police simply exhausted their leads but remained interested in reopening the case should Dong return home. When asked at oral argument which of these scenarios might be true, the government answered candidly that "[w]e simply do not know." Oral Argument at 28:59–29:25. Were this the ordinary case, with the burden of proof on the applicant, that might be enough; we could not reverse the agency's determination unless the record "compel[led]" selection of a plausible inference different than the one adopted by the agency. *Niang*, 492 F.3d at 511. But it is not enough here, where it is up to the government to prove that its inference is the more likely one: that if in fact local police stopped searching for Dong after September 2009, the more probable explanation is that Chinese authorities have decided no longer to target Dong for persecution should he return.

For all of these reasons, we are compelled to conclude that the agency erred in finding that the presumption of a well-founded fear of persecution to which Dong is entitled was rebutted by an adequate showing of a "fundamental change in circumstances." No reasonable adjudicator could find that either of the facts on which

18

the agency relied, alone or together, establish by a preponderance of the evidence that Chinese authorities have changed their minds about Dong and no longer impute to him a pro-Falun Gong opinion or have an interest in punishing him. We accordingly vacate the agency's ruling that the presumption was rebutted on this ground.

**B.**

There is, as we describe above, an additional ground on which the presumption of a well-founded fear of persecution may be rebutted: Even if there has been no fundamental change in circumstances, the government may rebut the presumption by proving, by a preponderance of the evidence, that the applicant "could avoid future persecution by relocating to another part" of his country. 8 C.F.R. § 1208.13(b)(1)(i)(B), (ii). The agency denied Dong's application on this separate ground, as well. But as the government concedes, this alternative holding is not a basis on which we may affirm the agency's decision. In considering the relocation issue, the IJ expressly failed to hold the government to its burden of proof, instead shifting that burden to Dong and holding that Dong had "not met *his* burden to show it would be unreasonable for him to relocate within China to avoid persecution." A.R. 48 (emphasis added). And although Dong raised that error on appeal to the BIA, the Board did not correct it, concluding instead that there was "no clear error" in the IJ's determination. A.R. 4. Accordingly, we vacate this portion of the agency's ruling as well, and remand for further consideration with the burden of proof properly placed on the government.

19

**IV.**

For the foregoing reasons, we grant the petition for review, vacate the denial of the asylum and withholding claims, and remand for further proceedings consistent with this opinion.

*PETITION FOR REVIEW GRANTED AND*
*REMANDED FOR FURTHER PROCEEDINGS*